## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **CAROL MURPHY,** | ) | |
| | ) | |
| **Petitioner** | ) | |
| | ) | |
| **v.** | ) | **Civil Nos. 08-80-B-H** |
| | ) | **08-81-B-H** |
| | ) | |
| **STATE OF MAINE,** | ) | |
| | ) | |
| **Respondent** | ) | |

### RECOMMENDED DECISION ON MOTIONS TO DISMISS
### PETITIONS FOR WRIT OF HABEAS CORPUS

Carol Murphy, proceeding *pro se*, files two separate petitions pursuant to 28 U.S.C. § 2254,

seeking relief on substantially identical grounds from (i) a ruling of Maine Superior Court Justice M.

Michaela Murphy regarding her failure to pay a fine imposed as part of a sentence for animal cruelty

and (ii) a lifetime prohibition against ownership of animals imposed as part of that sentence by

Maine Superior Court Justice Joseph M. Jabar.  *See* Petition for Relief From a Conviction or

Sentence By a Person in State Custody (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas

Corpus) ("First Habeas Petition") (Docket No. 1), Civil No. 08-80-B-H; Petition for Relief From a

Conviction or Sentence By a Person in State Custody (Petition Under 28 U.S.C. § 2254 for a Writ of

Habeas Corpus) ("Second Habeas Petition") (Docket No. 1), Civil No. 08-81-B-H.  The State of

Maine ("State") moves to dismiss both petitions on identical grounds.  *See* Respondent's Motion To

Dismiss Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, Civil No. 08-80-B-H

("First Motion To Dismiss") (Docket No. 3); Respondent's Motion To Dismiss Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, Civil No. 08-81-B-H ("Second Motion To Dismiss") (Docket No. 3).  For the reasons that follow, I recommend that the State's motions be granted.

## I.  Applicable Legal Standards

"The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) places new restrictions on a district court's power to grant writs of habeas corpus to state prisoners." *Johnson v. Norton*, 249 F.3d 20, 25 (1st Cir. 2001) (footnote omitted).  As the First Circuit has summarized the relevant principles:

> A habeas petition may not be granted unless the state court decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  A state court's holdings on factual issues "shall be presumed to be correct" and the petitioner bears the burden of disproving factual holdings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

*Brown v. Maloney*, 267 F.3d 36, 39-40 (1st Cir. 2001).

"A state court decision is 'contrary to' clearly established federal law if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Johnson*, 249 F.3d at 25-26 (citation and internal quotation marks omitted).  "Under the 'unreasonable application' clause, a writ may issue if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 26 (citation and internal quotation marks omitted).

The "unreasonable application" prong of the test, in turn, "reduces to the question of whether the state court's derivation of a case-specific rule from the Supreme Court's jurisprudence on the point appears to be objectively reasonable." *Brown*, 267 F.3d at 40.  "The test is not so stringent as

to require that all reasonable jurists agree that the state court decision was unreasonable." *Id*. On the other hand, the "mere fact that some fair-minded judges might find a particular outcome unreasonable does not warrant relief." *Mastracchio v. Vose*, 274 F.3d 590, 597 (1st Cir. 2001) (citation and internal quotation marks omitted). "Nor does the existence of error, in and of itself: there is, for this purpose, an important distinction between unreasonable applications and incorrect applications." *Id*. (citation and internal quotation marks omitted). "Refined to bare essence, a state court decision is objectively unreasonable only if it falls outside the universe of plausible, credible outcomes." *Id*. (citation and internal quotation marks omitted).

## II. Background

On March 16, 2004, the State filed a civil complaint in the Maine District Court, Farmington, charging Murphy with one count of cruelty to animals in contravention of 7 M.R.S.A. § 4011(1)(E). *See* Docket Record, *State v. Murphy*, Docket No. FARDC-VI-2004-00141 (Me. Dist. Ct.), contained in State Court Record ("Record"), filed with First Motion To Dismiss. On March 22, 2004, the State filed a criminal complaint charging Murphy with four counts of failure to have a license or permit, a Class E offense, in violation of 12 M.R.S.A. § 7371(3). *See* Docket Record, *State v. Murphy*, Docket No. FARDC-CR-2004-00429 (Me. Dist. Ct.), contained in Record, at 1.[1]

On March 24, 2004, the civil proceeding was discharged, and Murphy was summonsed for cruelty to animals in violation of 17 M.R.S.A. § 1031, a Class D criminal offense. *See* Docket Record, *State v. Murphy*, Docket No. FARDC-VI-2004-00141 (Me. Dist. Ct.). A criminal complaint charging Murphy with cruelty to animals in violation of 17 M.R.S.A. §1031(1)(E) was filed on April 13, 2004. *See* Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00152 (Me. Super.

---

[1] Murphy was charged with one count each of possession without a permit of a Quaker parrot, a peacock, a pygmy hedgehog, and a Russian tortoise. *See* Transcript, Trial Proceedings (with jury), *State v. Murphy*, Docket No. 04-152

Ct.), contained in Record, at 1. On April 28, 2004, Murphy entered a plea of not guilty to the charges, *see* Docket Record, *State v. Murphy*, Docket No. FARDC-CR-2004-00429, at 1, and the cases were transferred to the Maine Superior Court for jury trial, *see id*. at 2; Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00152 (Me. Super. Ct.), at 1; Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00153 (Me. Super. Ct.), contained in Record, at 1. Murphy filed no motion to suppress in either court. *See generally* Docket Records, *State v. Murphy*, Docket Nos. FARDC-VI-2004-00141 & FARDC-CR-2004-00429 (Me. Dist. Ct.) & Docket Nos. FARSC-CR-2004-00152 & FARSC-CR-2004-00153 (Me. Super. Ct.).

Justice Jabar presided over Murphy's jury trial, which was held from March 2-4, 2005, at the Maine Superior Court in Farmington. *See* Docket Record, *State v. Murphy*, Docket Nos. FARSC-CR-2004-00152 & FARSC-CR-2004-00153 (Me. Super. Ct.), at 2-3. On March 4, the jury returned a verdict of guilty on all five counts. *See* Trial Transcript at 595-96. With respect to the charge of cruelty to animals, Justice Jabar sentenced Murphy on May 12, 2005 to a six-month term of imprisonment with all but 24 hours suspended, followed by one year's probation; ordered her to pay a fine of $1,000 and restitution of $3,174; and permanently banned her from possessing animals. *See* Transcript of Sentencing, *State v. Murphy*, Docket No. CR-04-152 & 153 (Me. Super. Ct. May 12, 2005) ("Sentencing Transcript"), contained in Record, at 39-41. He imposed a 24-hour sentence on each of the four charges of possession without a permit, to be served concurrently with the sentence imposed on the cruelty to animals charge, and ordered payment on each of those charges of $10 to a Victims' Compensation Fund. *See id.* at 41; Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00153 (Me. Super. Ct.), at 4-5.[2]

_____

& 153 (Me. Super. Ct. Feb. 14, 2005 & Mar. 2-4, 2005) ("Trial Transcript"), contained in Record, at 595-96.

[2] On his own initiative, Justice Jabar issued an order dated December 26, 2007, pursuant to Maine Rule of Criminal

4

On May 27, 2005, Murphy filed a notice of direct appeal from her judgment of conviction to the Maine Supreme Judicial Court, sitting as the Law Court. *See* Law Court Docket Sheet, *State v. Murphy*, Docket No. FRA-05-287 (Me.), contained in Record. In her *pro se* brief, she argued that (i) animal-welfare agents conducted three illegal seizures of her animals without warrants, or with defective warrants, on March 8, 16, and 22, 2004, and (ii) she did not receive procedural or substantive due process, and her constitutional and civil rights were violated, by reason of the conduct of Assistant District Attorney Andrew Robinson, in prosecuting the case against her, and of Justice Jabar, in issuing certain rulings against her including rulings excluding evidence sought to be introduced by the defense. *See* Appellant's Brief, *State v. Murphy*, Docket No. FRA-05-287 (Me.), contained in Record, at 8-24. She also contended that she had committed no crime because (i) she did not treat her animals cruelly, (ii) the evidence against her was trumped up by State agents and animal welfare activists, and/or (iii) animal-welfare laws cannot constitutionally be applied to animal owners, who are entitled to do what they wish with their own property, be it a television set, a refrigerator, or an animal. *See id*. at 1-7.

By decision dated July 27, 2006, the Law Court affirmed the judgments of conviction against Murphy, ruling:

> Contrary to Murphy's contentions: (1) the court did not commit obvious error in admitting evidence obtained from seizures executed pursuant to 17 M.R.S. § 1021 (2005), *see State v. Rega*, 2005 ME 5, ¶¶ 17, 21, 863 A.2d 917, 922, 923; *State v. Beathem*, 482 A.2d 860, 862 (Me. 1984); (2) we are convinced beyond a reasonable

---

Procedure 50, directing that an amended Judgment and Commitment be prepared containing a permanent prohibition against Murphy's possession of any animals, a condition omitted from the Judgment and Order entered on May 12, 2005. *See* Order, *State v. Murphy*, Docket No. CR-04-152 (Me. Super. Ct. Dec. 26, 2007); Amended Judgment and Commitment, *State v. Murphy*, Docket No. FARSC-CR-2004-00152 (Me. Super. Ct. Dec. 26, 2007), included in Exh. Eleven to Habeas Corpus – Judge Michaela Murphy – Void Sentence ("First Habeas Addendum"), attached to First Habeas Petition. The amended Judgment and Commitment reflects that Murphy was ordered to pay a fine of $2,000; however, as the State notes, *see* First Motion To Dismiss at 2 n.1, the Sentencing Transcript indicates that the court ordered her to pay a $1,000 fine, *see* Sentencing Transcript at 39.

doubt that any asserted constitutional error in applying the Animal Protection Act was not obvious error affecting the defendant's substantial rights, *State v. Schofield*, 2005 ME 82, 28, 895 A.2d 927, 935; (3) the court did not err in excluding evidence Murphy offered, M.R. Evid. 401, 402; (4) the Animal Protection Act does permit the prosecution of animal owners, 17 M.R.S. § 1031(1)(E); and (5) viewing the evidence in the light most favorable to sustaining the verdict, the jury could rationally find each element of the offenses beyond a reasonable doubt, *State v. Allen*, 2006 ME 20, ¶ 26, 892 A.2d 447, 455.

Memorandum of Decision, *State v. Murphy*, Docket No. FRA-05-287 (Me. Jul. 27, 2006), contained in Record.  On August 9, 2006, Murphy filed a motion for reconsideration, which the Law Court denied on September 20, 2006.  *See* Law Court Docket Sheet, *State v. Murphy*, Docket No. FRA-05-287 (Me.).  On November 14, 2006, Murphy filed a petition for a writ of certiorari with the United States Supreme Court ("Supreme Court"), seeking review of the Law Court's decision.  *See* Docket Sheet, *Murphy v. Maine*, Docket No. 06-125 (S. Ct.), contained in Record.  On January 8, 2007, the Supreme Court denied her petition.  *See id.*  On January 29, 2007, she filed a petition for rehearing, which the Supreme Court denied on March 19, 2007.  *See id.*

On April 18, 2006, the State filed a motion to revoke Murphy's probation, alleging that she had failed to pay her fines and restitution.  *See* Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00152, at 7.  On October 2, 2006, Murphy entered a denial to the allegation.  *See id.* at 8.  On October 5, 2006, Murphy was ordered to pay $75 monthly, beginning on January 2, 2007, or a warrant would issue.  *See id.*  On December 18, 2006, Murphy filed a motion for arrest of judgment. *See* Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00153, at 7.  That motion was granted on January 5, 2007, and payment of fines and restitution was stayed pending resolution of the then-pending petition to the Supreme Court for a writ of certiorari.  *See id.*  The stay was to be vacated, and payments were to be automatically resumed, upon any denial of certiorari.  *See id.*  On April 24, 2007, Murphy filed a second motion for arrest of judgment, which was denied on June 4, 2007.  *See id.*

Hearings thereafter were scheduled, then continued, several times on the issue of Murphy's continuing non-payment of the fines. *See id.* A hearing was convened at the Maine Superior Court on January 28, 2008 to address Murphy's continued failure to pay her outstanding fines; however, it was continued when, on the same day, she filed a motion for an injunction/restraining order against Maine officials and employees. *See id.* at 7-8. That day, Murphy's motion for an injunction/restraining order was denied. *See id.* at 8. Murphy's fine payment hearing was rescheduled for February 29, 2008. *See id.* On that day, Murphy filed a demand for Justice Murphy to recuse herself, which Justice Murphy denied. *See id.* Justice Murphy issued a new payment schedule ordering Murphy to pay $50 monthly commencing on March 13, 2008, or a warrant would issue. *See id.*

On March 13, 2008, Murphy filed a notice of appeal to the Law Court. *See* Law Court Docket Sheet, *State v. Murphy*, Docket No. FRA-08-126 (Me.), contained in Record. On the same day, she filed the instant habeas petitions in this court. *See* Docket No. 1, Civil No. 08-80-B-H; Docket No. 1, Civil No. 08-81-B-H.[3]

### III. Discussion

In her First Habeas Petition, Murphy asks this court to "stop Judge Murphy's threats to jail me because I am too poor to pay court fines based on a void case" and to "stop the harassment by state racketeers (officials)." First Habeas Petition at 16. In her Second Habeas Petition, she urges the court to "[r]evoke Judge Jabar's Unconstitutional Life Sentence[,]" in addition to reiterating that

---

[3] In her First Habeas Petition, Murphy noted that she had requested that transcripts of the January 28, 2008, and February 29, 2008, hearings before Justice Murphy be sent to this court's clerk's office in Bangor. No such documents were received. *See generally* Docket, Civil No. 08-80-B-H. The Superior Court's Docket Record indicates that Murphy's request for preparation of a transcript at the State's expense was denied. *See* Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00153, at 8. It is the petitioner's responsibility to provide documents to bolster her case. In any event, the transcripts are not outcome-determinative.

7

"[f]ines cannot be collected from an indigent person nor can they be put in jail for being too poor to pay" and seeking "[r]elief from constant harassment by State racketeers (officials)."  Second Habeas Petition at 16.   In the body of both petitions, she lists four grounds for the requested relief: (i) insufficiency of the evidence to convict her on a charge of cruelty to animals predicated on lack of veterinary care, given her evidence that she spent $10,000 on veterinary bills and that, pursuant to the testimony of one of her veterinarians, her animals were well cared for, (ii) at least five searches of her locked house and barn without warrants, (iii) three thefts of her property, in the form of seizure of animals, and (iv) lack of notice.  *See* First Habeas Petition at 6-12; Second Habeas Petition at 6-12.

Murphy appends to both petitions addenda, accompanied by exhibits, detailing what she describes as additional due-process violations and additional grounds.  *See* First Habeas Petition at 12; Second Habeas Petition at 12; *see also generally* First Habeas Addendum & exhibits thereto; Habeas Corpus – Judge Joseph Jabar – Void Sentence ("Second Habeas Addendum"), attached to Second Habeas Petition, & exhibits thereto.  The addenda are identical save that the Second Habeas Addendum omits seven paragraphs (paragraphs 35-41) contained in the first.  *Compare generally* First Habeas Addendum *with* Second Habeas Addendum.  The State fairly characterizes the First Habeas Addendum as setting forth a broad fifth ground for relief predicated on "[v]arious due process violations, starting with the Animal Welfare agents that seized her animals, the state prosecutor, the district court judges who signed the warrants authorizing the seizures, the trial justice, the justices of the Law Court and the United States Supreme Court, the judges of this Court (and the judges in New Hampshire and Rhode Island), and the justices who have ordered her to

make payments on her outstanding fines and restitution." First Motion To Dismiss at 5, 7; *see also generally* First Habeas Addendum & exhibits thereto.[4]

The State seeks dismissal of both petitions on the bases that:

1.      With respect to Ground One, the Law Court's decision that the evidence was sufficient to sustain Murphy's conviction for animal cruelty was not contrary to, or an unreasonable application of, clearly established federal law. *See* First Motion To Dismiss at 5-6.

2.      With respect to Grounds Two through Four, Murphy was afforded, yet failed to take advantage of, an opportunity for full and fair litigation of her Fourth Amendment search and seizure claims and hence is barred pursuant to *Stone v. Powell*, 428 U.S. 465 (1976), from obtaining habeas corpus relief on those grounds in this court. *See id.* at 6-7.

3.      With respect to Ground Five, to the extent that Murphy preserved these various due-process claims in the state courts, they are completely without merit. *See id.* at 7. Due process is not violated when state law-enforcement agents bring charges where they are warranted, prosecutors prosecute those charges, trial justices preside over trials on those charges and impose sentences when a jury has found the defendant guilty, appellate justices find no error in the proceedings below, and federal judges find lawsuits based on those actions by state law-enforcement and judicial officials frivolous. *See id.*[5]

---

[4] In seeking dismissal of the Second Habeas Petition, the State relies on and incorporates by reference the arguments made in its motion to dismiss the First Habeas Petition. *See generally* Second Motion To Dismiss.

[5] It is unclear whether Murphy means to add, as grounds for relief, challenges to the constitutionality of the recent substantive rulings from which she seeks relief: those of Justice Jabar in December 2007, amending the Judgment and Commitment to add a permanent ban against animal ownership, and of Justice Murphy in February 2008, ordering her to pay her fines or face issuance of a warrant for her arrest. *See generally* First Habeas Addendum; Second Habeas Addendum; *see also* Judicial Notice (Docket No. 6), Civil No. 08-81-B-H, at 4-6. I will construe the petitions not to do so, not only because they are unclear on the point but also because Murphy evidently had not exhausted her state-court remedies with respect to any such claims as of the time she filed the instant petitions. *See* First Habeas Addendum at 11 (indicating that during the first week of February 2008, Murphy appealed Justices Jabar's and Murphy's rulings to the

## A.  Ground One: Sufficiency of Evidence

This court has identified *Jackson v. Virginia*, 443 U.S. 307 (1979), and *In re Winship*, 397 U.S. 358 (1970), as setting forth controlling federal law for purposes of the question of whether the evidence adduced at a criminal trial is sufficient to sustain a conviction.  *See, e.g., Penman v. Berry*, Civil No. 06-113-B-W, 2006 WL 3931604, at *5 & n.3 (D. Me. Jan. 18, 2007) (rec. dec., *aff'd* Jan. 30, 2007).[6]  Pursuant to *In re Winship/Jackson*, "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at *5 (citation and internal quotation marks omitted). This standard "must be applied with specific reference to the elements of the offense as defined by state law." *Id*. at *5 n.3.

The State charged Murphy with having committed cruelty to animals, a Class D offense in violation of 17 M.R.S.A. § 1031(1)(E), during the time frames from January 1, 2004, to March 22, 2004.  *See* Docket Record, *State v. Murphy*, Docket No. FARSC-CR-2004-00152, at 1-2.  Section 1031(1)(E) states that, with certain exceptions not here relevant, "a person, including an owner or the owner's agent, is guilty of cruelty to animals if that person intentionally, knowingly or recklessly . . . [d]eprives an animal that the person owns or possesses of necessary sustenance, necessary medical attention, proper shelter, protection from the weather or humanely clean conditions." 17 M.R.S.A. § 1031(1)(E).  A person acts "intentionally, knowingly or recklessly" in the following circumstances:

Chief Judge of the Maine Superior Court, who had "chosen not to answer"); Law Court Docket Sheet, *State v. Murphy*, Docket No. FRA-08-126 (on March 13, 2008, Murphy appealed Justice Murphy's fine rulings to the Law Court). "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thus giving the state the first opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Josselyn v. Dennehy*, 475 F.3d 1, 2-3 (1st Cir. 2007) (citation and internal quotation marks omitted).

[6] While Westlaw indicates this decision was filed on January 18, 2006, the court's docket indicates it was filed on

**1. "Intentionally."**

**A.**  A person acts intentionally with respect to a result of the person's conduct when it is the person's conscious object to cause such a result.

**B.**  A person acts intentionally with respect to attendant circumstances when the person is aware of the existence of such circumstances or believes that they exist.

**2. "Knowingly."**

**A.**  A person acts knowingly with respect to a result of the person's conduct when the person is aware that it is practically certain that the person's conduct will cause such a result.

**B.**  A person acts knowingly with respect to attendant circumstances when the person is aware that such circumstances exist.

**3. "Recklessly."**

**A.**  A person acts recklessly with respect to a result of the person's conduct when the person consciously disregards a risk that the person's conduct will cause such a result.

**B.**  A person acts recklessly with respect to attendant circumstances when the person consciously disregards a risk that such circumstances exist.

**C.**  For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to the person, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

17-A M.R.S.A. § 35.

Here, as in *Penman*, the Law Court's decision cannot be characterized as "contrary to" *In re Winship/Jackson* inasmuch as its finding that the evidence was sufficient to convict Murphy of cruelty to animals constituted "a run-of-the-mill state-court decision applying the correct legal rule from the Supreme Court's cases to the facts of a prisoner's case." *Penman*, 2006 WL 3931604, at *5 (citation and internal punctuation omitted).  As in *Penman*, while the Law Court "may not have

---

January 18, 2007.

articulated the pros and cons of the prosecution's case[,]" it expressly referred to a sufficiency-of-the-evidence standard consistent with that set forth in *In re Winship/Jackson*. *See id.* at *6; *see also* Memorandum of Decision, *State v. Murphy*, Docket No. FRA-05-287 (Me. Jul. 27, 2006) ("[V]iewing the evidence in the light most favorable to sustaining the verdict, the jury could rationally find each element of the offenses beyond a reasonable doubt, *State v. Allen*, 2006 ME 20, ¶ 26; 892 A.2d 447, 455."); *State v. Allen*, 2006 ME 20, ¶ 26; 892 A.2d 447, 455 ("In the context of a criminal defendant's argument that the evidence is insufficient to support the conviction, we review the evidence in the light most favorable to the jury's verdict to determine if the factfinder, acting rationally, could find every element of the offenses beyond a reasonable doubt.") (citations and internal quotation marks omitted).

Nor did the Law Court's decision constitute an "unreasonable application" of the *In re Winship/Jackson* standard to the facts of Murphy's case. Here, as in *Penman*, "[i]t is evident from a review of the entire trial transcript that a rational fact-finder . . . could have concluded that the State had proven [its case] beyond a reasonable doubt[.]" *Penman*, 2006 WL 3931604, at *6.

Murphy was charged not merely with cruelty to animals based on deprivation of necessary veterinary care but, more broadly, with cruelty predicated on deprivation "of necessary sustenance, necessary medical attention, proper shelter, protection from the weather or humanely clean conditions." 17 M.R.S.A. § 1031(1)(E); *see also* Trial Transcript at 584-88 (jury instructions). As Justice Jabar instructed the jury:

> [N]ecessary sustenance means that food shall be of sufficient quantity and quality to maintain all animals in good health. If potable drinkable water is not accessible to the animals at all times, it must be provided daily and in sufficient quantity for the health of the animals. Snow or ice is not an adequate water source.

> [Necessary medical attention] means the animals must be supplied with necessary medical attention when the animal is or has been suffering from illness, injury, disease, or excessive parasitism.

. . . There are certain indoor standards, minimum indoor standards of shelter shall be as follows: The ambient temperature shall be compatible with the health of the animal.  Indoor housing facilities shall be adequately ventilated by natural or mechanical means to provide for the health of the animal at all times.

Livestock must be provided with shelter suitable for the health of the animals.  Livestock must have access to a constructed shelter, that is large enough to accommodate all livestock comfortably at one time.  The shelter shall be well drained and protect the livestock from direct sun, rain, wind and other inclimate [sic] weather.

Specifically for horses, the shelter must have a minimum of three sides and waterproof roof appropriate to the local climatic conditions for the species concerned.

. . . [M]inimum standards of sanitation necessary to provide humanely clean conditions for both indoor and outdoor enclosures shall include periodic cleanings to remove excretions and other waste materials, dirt and trash to minimize health standards [sic].

Trial Transcript at 585-86; *see also* 17 M.R.S.A. §§ 1035 (necessary sustenance); 1036 (necessary medical attention), 1037 (proper shelter; protection from the weather and humanely clean conditions).     The jury need only have found that Murphy was guilty of cruelty to one of the many animals with respect to which evidence was presented to be found guilty as charged.  *See* Trial Transcript at 592.

In her defense, Murphy offered evidence that she had secured veterinary care for some animals, bought some animals sick at auction and endeavored to nurse them back to health, bought feed from various vendors, and sought help and advice on the care of her animals.  *See id.* at 401-534 (Murphy's testimony), 534-40 (testimony of Dr. E.L. Cooper regarding contacts with Murphy), 540-41 (testimony of Rosemary Eller, a neighbor from whom Murphy sought advice on animals and borrowed a feeding tube), 542-43 (testimony of Herbert Quimby that Murphy purchased hay from him on November 20, 2003 and December 29, 2003), 543-45 (testimony of Zacheus Gammon that Murphy purchased hay from him in the fall of 2002 and thereafter in wintertime).

Perhaps the strongest evidence on Murphy's behalf was that of Dr. Cooper, who testified that he had treated her animals on three occasions prior to March 18, 2004, and that, when he was called to attend to a sick calf inside her home on that day, he observed that her turtles' water was full and clear, and that the animals and birds inside her home appeared to be reasonably well cared for, with clean papers and water in their cages. *See id*. at 534-39.   Nonetheless, a rational trier of fact could have taken into account that Murphy arranged for Dr. Cooper's March 18, 2004, visit after some of her animals already had been seized by the State on March 8, 2004, *see, e.g., id*. at 113, and that Dr. Cooper had never been inside her home prior to that date, *see id*. at 538, raising doubt about whether the conditions that he observed were representative of conditions present prior to that time. Moreover, a reasonable trier of fact might have questioned how closely Dr. Cooper examined the animals in Murphy's home.  He testified that, when called to her house on March 18, 2004, he "came just for one thing, to look at the calf," and that "while I was in there she asked me to look at the other animals.  I wasn't called to look at the animals."  *Id*.

For its part, the State put on a substantial case against Murphy, presenting sufficient evidence to permit a rational trier of fact to conclude beyond a reasonable doubt that, during the relevant time frame, Murphy committed cruelty to one or more of her dozens of animals in each of the respects specified in section 1031(1)(E).  In addition, the State's evidence revealed poor treatment of animals of sufficient scope and magnitude to permit a rational trier of fact to infer that Murphy's conduct was, at the least, reckless.  This included evidence of:

1.      **Lack of necessary sustenance**.  *See id.* at 62-74 (testimony of Animal Control Officer Bentley Rathbun that on January 25, 2004, he observed a frozen, feces-filled tub of water and no visible feed in the yard where Murphy kept sheep, ponies, goats, geese, and ducks, and conditions appeared unchanged on followup visits on February 3, February 12, February 25, and

March 8, 2004), 106, 111-12 (testimony of Rathbun that he observed that sheep had poor quality wool and that one was chewing other's wool, signs of poor nutrition), 134-44 (testimony of Mary Baumgarten, a former acquaintance of Murphy's, that on visit to Murphy home on January 25, 2004, she observed a "disturbing" sight of a heap of dead animals piled outside the house and noticed that Murphy's outdoor animals had only water that appeared to have been frozen "for some time"; upon a return visit on February 7, 2004, she let herself into Murphy's home and found "horrible" conditions, including hungry animals with no food rooting for water in the shower; Murphy's outdoor livestock also had no food or water), 184-89 (testimony of farmer Melanie Nadeau that when she went to the Murphy residence on March 6, 2004, to help remove a dead pony from Murphy's barn, she observed no hay and bone-dry water buckets in the barn), 254-57, 267-69, 272-73, 277-90 (testimony of Dr. Christine Frasier, a veterinarian employed by the State of Maine Animal Welfare Program, that when she went to the Murphy residence on March 8, 2004, in response to a call from Nadeau concerning a sick horse, she observed no food or water in Murphy's barn, and animals appeared to be underweight; when she returned to the Murphy residence on March 22, 2004, as part of a team executing a search warrant, she observed no food or water in the cages of many of Murphy's indoor animals, including a peacock, tortoises, and rabbits), 343, 348-49 (testimony of Animal Control Officer Wayne Atwood that when the State brought hay to Murphy's outdoor animals on March 8, 2004, they swarmed it as though they had been without food for a little while), 358, 363-71 (testimony of Dr. Robert Patterson, a veterinarian who performed autopsies on dead animals and inspected live animals seized or obtained from Murphy's premises, that one of Murphy's calves and one of her sheep died from dehydration and lack of food, and two live sheep were very thin).

2.      **Lack of necessary medical attention**.  *See id*. at 200-03, 209 (testimony of Nadeau

that Murphy phoned her at approximately 7:00 a.m. on March 8, 2004, to seek her help because one

of her horses, Thunder, was down and she had no money for a veterinarian; that Nadeau arrived at

Murphy's residence at 8:30 a.m. and observed Thunder lying on his side in a manure pile in the barn

thrashing and groaning and advised Murphy to phone a veterinarian; that Murphy reiterated that she

had no funds to do so; and that Nadeau then obtained from Murphy written permission to euthanize

the horse), 78-9 (testimony of Rathbun that upon arrival at Murphy's residence on March 8, 2004, he

observed a horse prone in a filthy barn in apparent extreme pain), 272, 277-84 (testimony of Dr.

Frasier that, upon entering Murphy's home on March 22, 2004, she observed a peacock with beak in

need of trimming so that he could eat properly, tortoises with what appeared to be shell rot, and a

parakeet with a beak in need of trimming who seemed lethargic and dull), 370-71 (testimony of Dr.

Patterson that sheep he examined were infested with lice).

3.      **Lack of proper ventilation for the indoor animals**.  *See id*. at 190-92 (testimony of

Nadeau that the inside of Murphy's home on March 7, 2004, smelled of manure and animal urine, "it

was horrible[,]" all drapes were tightly shut, there was no daylight in the house, it was very dark, no

windows or doors were open, and there was no ventilation at all), 275-76 (testimony of Dr. Frasier

that the inside of Murphy's house on March 22, 2004, smelled strongly of an unhealthy mix of

ammonia and animal feces, and there appeared to be no ventilation of any sort for all of the animals

housed there).

4.      **Lack of humanely clean conditions**.  *See id*. at 73 (testimony of Rathbun that a

frozen tub of water in Murphy's yard was full of feces), 140-43 (description by Baumgarten of the

inside of Murphy's home on February 7, 2004, as "horrible," with a foul odor, feces on every

surface, filthy animal cages, and a calf sitting on a urine-soaked blanket), 188 (testimony of Nadeau

that stalls in Murphy's barn, observed on March 6, 2004, "needed to be cleaned desperately, they were full of manure, there was no clean shavings"), 190-91 (testimony of Nadeau that the inside of Murphy's home on March 7, 2004, was dark, had no ventilation, and smelled; the place was filthy with manure and urine), 262-63 (testimony of Dr. Frasier that, on March 8, 2004, she observed Murphy's ailing horse lying in a mix of mashed feces and urine with no distinguishable bedding; conditions were filthy; the stall had not been cleaned in some time).

In sum, the Law Court's finding regarding the sufficiency of the evidence to convict Murphy of cruelty to animals in violation of 17 M.R.S.A. § 1031(1)(E) was entirely consistent with governing standards of federal law.  There is no basis under AEDPA to disturb it.

### B.  Grounds Two-Four: Asserted Fourth Amendment Violations

As the State points out, *see* First Motion To Dismiss at 6-7, in *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial[,]" *Stone*, 428 U.S. at 494 (footnotes omitted).  In turn:

> '[A] full and fair opportunity' to litigate means that the state has made available to defendants a set of procedures suitably crafted to test for possible Fourth Amendment violations.  So long as a state prisoner has had an opportunity to litigate his Fourth Amendment claims by means of such a set of procedures, a federal habeas court lacks the authority, under *Stone*, to second-guess the accuracy of the state court's resolution of those claims.

*Sanna v. DiPaolo*, 265 F.3d 1, 9 (1st Cir. 2001) (citations omitted).

There is an exception to the *Stone* bar "for instances in which a habeas petitioner had no realistic opportunity to litigate his Fourth Amendment claim fully and fairly in the state court system." *Id.* at 8.  However, "[t]he petitioner bears the burden of proving that his case fits within the contours of the exception." *Id.*

As the State suggests, *see* First Motion To Dismiss at 7, Maine Rule of Criminal Procedure 41A constitutes a procedure suitably crafted to test for Fourth Amendment violations.  It expressly affords criminal defendants the right to move to suppress evidence, *inter alia*, of physical objects on the ground that they were illegally obtained.  *See* Me. R. Crim. P. 41A(a).  There is no evidence that the State failed to afford Murphy, who was represented by various counsel prior to and through the time of her trial, a realistic opportunity to avail herself of a suitable procedure for testing her Fourth Amendment claims.  In addition, although Murphy did not avail herself of the right to move to suppress assertedly illegally-obtained evidence, the Law Court on appeal reviewed her Fourth Amendment claims for obvious error, finding none.  *See* Memorandum Decision, *State v. Murphy*, Docket No. FRA-05-287 (Me. Jul. 27, 2006).  In these circumstances, the Fourth Amendment claims that Murphy presses in Grounds Two through Four form no predicate for habeas relief.  *See Mendenhall v. Kincheloe*, No. 89-35154, 1990 WL 2880, at *1 (9th Cir. Jan. 18, 1990) (in case in which habeas petitioner failed to avail himself of opportunity for suppression hearing pursuant to Washington rule of criminal procedure, magistrate correctly held his challenge to sufficiency of search warrant non-cognizable on federal habeas); *Lenza v. Wyrick*, 665 F.2d 804, 808 (8th Cir. 1981) ("It is the existence of state processes allowing an opportunity for full and fair litigation of fourth amendment claims, rather than a defendant's use of those processes, that bars federal habeas corpus consideration of claims under *Stone*."); *Sallie v. State of N.C.*, 587 F.2d 636, 639 (4th Cir. 1978) ("Having failed to use the opportunity to litigate his fourth amendment claim in state court, Sallie is foreclosed by *Stone* from pursuing it on federal habeas corpus.").

### C.  Ground Five: Additional Due-Process Violations

The State finally asserts that, to the extent that Murphy preserved the various due-process claims in state court that the State has categorized as Ground Five (those contained in her addenda), they are frivolous.  *See* First Motion To Dismiss at 7.  I agree.

These additional grounds consist largely of allegations that the prosecutor, in prosecuting the animal-cruelty case against Murphy, and the trial justice and other judges, in issuing rulings against her, themselves violated her rights (or, worse, committed treason or engaged in a conspiracy against her).  *See generally* First Habeas Addendum; Second Habeas Addendum.  These claims are frivolous.  As this court recently observed: "A judge's rulings, and an opposing lawyer's arguments, are not grounds for adding them as defendants in the plaintiff's lawsuit.  Moreover, a judge has absolute immunity from civil liability for his rulings in a lawsuit."  *Nickerson-Malpher v. Worley*, Civil No. 17-136-P-H, 2008 WL 2440201, at *2 (D. Me. June 17, 2008).  Prosecutors, as well, are protected by absolute prosecutorial immunity.  *See, e.g., Reid v. State of N.H.*, 56 F.3d 332, 336-37 (1st Cir. 1995) (allegations that prosecutors withheld exculpatory evidence in direct violation of trial-court orders and repeatedly misled trial court throughout criminal proceedings did not strip prosecutors of immunity); *Gordon v. Maine*, No. 08-100-B-S, 2008 WL 2433196, at *2 (D. Me. June 13, 2008) (rec. dec., *aff'd* July 10, 2008) ("district attorney, as prosecuting officer of state, enjoys

absolute immunity from suit when acting within scope of official duty"). Murphy's numerous allegations against the prosecutor and judges afford her no viable basis for habeas relief.[7]

### IV. Conclusion

For the foregoing reasons, I recommend that the State's motions to dismiss both of Murphy's petitions for writs of habeas corpus be **GRANTED**.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

---

[7] Murphy alleges that the prosecutor knowingly introduced against her at trial (i) evidence obtained via Fourth Amendment violations, (ii) falsified exhibits, and (iii) perjured testimony. *See, e.g.*, First Habeas Addendum at 2-3. Even assuming *arguendo* the truth of these allegations, they do not strip the prosecutor of absolute immunity. *See, e.g., Reid*, 56 F.3d at 337 (noting existence of "absolute prosecutorial immunity for making false or defamatory statements in judicial proceedings (at least so long as the statements were related to the proceeding), and also for eliciting false and defamatory testimony from witnesses.") (citation and internal quotation marks omitted). Additionally, Murphy contends that no judge had jurisdiction over her case because the various Fourth Amendment violations of which she complains (*e.g.*, searches and seizures without a warrant or notice) rendered the proceedings against her *void ab initio*. *See, e.g.*, First Habeas Petition at 4; Second Habeas Petition at 4; *see generally* First Habeas Addendum; Second Habeas Addendum. While judicial immunity is overcome if a judge acts "in the complete absence of all jurisdiction[,]" *Mireles v. Waco*, 502 U.S. 9, 12 (1991); *see also, e.g., Gordon*, 2008 WL 2433196, at *2; *Nickerson-Malpher*, 2008 WL 2440201, at *2, the asserted Fourth Amendment violations, even assuming *arguendo* their truth, did not void Murphy's case from its inception or deprive any judge or court of jurisdiction to rule in regard to it. "The usual remedy for seizures made with a defective warrant is suppression in order to deter future violations of the Fourth Amendment." *United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007) (citations and internal punctuation omitted). As noted above, Murphy did not avail herself of the remedy of filing a motion to suppress the evidence that she now contends was illegally obtained.

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 24th day of July, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge